UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHANS CABRERA,

                Plaintiff,

  - against -

CITY OF NEW YORK; and CLAIRE LINDNER,

                Defendants.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
16-CV-2298 (RRM) (RER)

ROSLYNN R. MAUSKOPF, United States District Judge.

Johans Cabrera brings this *pro se* action, pursuant to 42 U.S.C. § 1983, alleging false arrest, malicious prosecution, and a host of other civil rights violations. The defendants – the City of New York and arresting officer Claire Lindner – moved for summary judgment. (Defs. Mot. (Doc. No. 40).) For the reasons set forth below, the Court grants the defendants' motion.

## BACKGROUND[1]

The events underlying this action took place in a roughly 24-hour period. On June 6, 2015, Cabrera went to a party hosted by Cabrera's friend, Kel-V, with his then-girlfriend KateLynn Abreu. (Cabrera Dep., Ex. F to Defs. Aff./Decl. (Doc. No. 42-6) at 65:3–24.) Cabrera and Abreu left that party in the early evening to go to another friend's backyard barbecue about a block away from the first party. (*Id.* at 75:3–25.) While at this second party, Abreu began fighting with Cabrera after she thought he was flirting with other women. (*Id.* at 77:2–23; 79:7–9.) They left the party after midnight and caught a cab, but were ejected because they were still arguing. (*Id.* at 76:2–4; 79:11–24.) Cabrera and Abreu exited the cab and continued arguing on the street as they walked to a nearby cabstand. (*Id.* at 79:15.) They soon left the stand without calling a cab and continued their argument as they walked down the street. (*Id.* at 79:17–22.)

---

[1] The facts are taken from the record and are undisputed unless otherwise noted.

Abreu then approached two police officers on the street and told them that Cabrera would not leave her alone and had hit her. (*Id.* at 80:3–13.) The officers told Cabrera to remain nearby as they radioed for assistance. (*Id.* at 101:7.) Cabrera, denying that he had hit Abreu, walked toward Kel-V's house, about one and a half blocks from where the police had instructed him to stay. (*Id.* at 102:13; 105:6–22.) The police caught up to Cabrera, arrested him in front of Kel-V's house for assault, obstructing governmental administration, resisting arrest, and harassment. (Ex. G (Doc. No 42-7) at 1.) Cabrera was then taken to the 115th precinct for processing. (Cabrera Dep. at 80:16–22; 105:20–22.)

In the afternoon of June 7, Cabrera appeared in criminal court for his arraignment. (*Id.* at 116:19–20.) The court ordered Cabrera released and issued a temporary order of protection (the "First Order"), which required Cabrera to stay at least 100 yards away from Abreu, and to refrain from either communicating with or assaulting Abreu. The First Order indicated that it was issued on June 7, 2015, and was to remain in force until December 4, 2015. Cabrera signed the Order indicating receipt of its terms. (Ex. H to Defs. Aff./Decl. (Doc. No. 42-8) at 1; Ex. F at 122:8–9.)

After the court entered the First Order, Cabrera told his defense attorney that Abreu, who was present in the courtroom, was willing to tell the prosecutor that Cabrera had never hit her. (Ex. F 123:5–21.) Cabrera's attorney then informed the judge that Abreu had recanted. (*Id.* at 118:17–19.) In response, the judge second-called the case and issued a second temporary order of protection (the "Second Order"). The Second Order directed Cabrera not to assault Abreu, but, unlike the First Order, did not include any stay-away provision. (Ex. I to Defs. Aff./Decl. (Doc. No. 42-9) at 1.) The Second Order was, like the first, dated June 7, 2015, and was to remain in effect until December 4, 2015. Once again, Cabrera signed it. The court provided

Cabrera with copies of both Orders, and Cabrera was then released on his own recognizance. (Ex. F at 129:17–25.)

Together with Abreu, Cabrera left the courthouse, and the two went to Kel-V's house to recount the events of the night before. (*Id.* at 131:15–25.) They then continued to the 115th precinct to pick up some of Cabrera's belongings that he had left behind following his arrest. (*Id.* at 130:1–3.) Once at the station, a sergeant recognized Cabrera from the night before and asked what Cabrera was doing there with Abreu. (*Id.* at 133:7–10; 134:9–18.) Cabrera told him that he had come to gather his belongings and handed over the copies of the two Orders to a male officer at the precinct. (*Id.* at 134:20–21; 135:7–12.) The sergeant and the officer read the Orders, and, according to Cabrera, the officer appeared to do some type of computer search. (*Id.* at 135:15–17.) The sergeant and officer then went into another room and "grabbed a bunch of officers," who entered the waiting area where Cabrera was sitting. (*Id.* at 135:22–23.)

Officer Claire Lindner then arrested Cabrera for violating a temporary order of protection. (Lindner Aff. (Doc. No. 43) ¶ 10.) In her sworn affidavit, Officer Lindner explains that the desk sergeant told her that Cabrera was in violation of an active order of protection. (*Id.* ¶ 3.) She read the Order that required Cabrera to remain at least 100 yards away from Abreu and noted that the Order had been issued that very day, June 7, and that it was to remain in effect until December 4, 2015. (*Id.* ¶¶ 5–7.) Officer Lindner was informed that the Order was still active. (*Id.* ¶ 9.) She does not mention anything about the Second Order. She then arrested Cabrera for criminal contempt because he was at the precinct with Abreu. (*Id.* ¶ 10.) In response to the arrest, Cabrera "really didn't say anything," except to note that, "this is crazy, I didn't even have an order of protection against me, I just walked out the courtroom with her." (Ex. F at 139:15–19.)

Officer Lindner handcuffed Cabrera with a single cuff behind his back. (*Id.* at 146:10.) Cabrera related at his deposition that, during the booking process, he "told [Officer Lindner] exactly how it happened, exactly what – exactly how it happened" and told her "about what happened in court." (*Id.* at 142:3–5; 146:20–23.)

Cabrera claims that while getting into the van to go to Central Booking, he told Officer Lindner that his handcuffs were too tight. (*Id.* 144:14–22.) Officer Lindner disputes this. (Lindner Aff. ¶¶ 13, 15.) Cabrera also claims that, once he was at Central Booking, he told Officer Lindner that his arm, shoulder, and wrists hurt and that the handcuffs were too tight. (*Id.* at 147:9–15.) Officer Lindner told Cabrera that there was nothing she could do. (*Id.* at 150:11–12.) As a result of the handcuffs, Cabrera says that his wrist is "messed up," "cracks," and hurts more when it is cold outside. (*Id.* at 155:7–10.)

Cabrera was eventually transferred to Department of Correction custody, where he told a corrections officer that he was in pain. (*Id.* at 151:16–19.) The officer responded that if Cabrera requested medical attention, then he would be held longer in order to obtain medical care. (*Id.* at 151:20–22.) Cabrera decided not to seek medical help. (*Id.* at 151:22.) Cabrera was released from custody at Central Booking. He received a letter from the criminal court apologizing for the court's error in imposing two conflicting temporary orders of protection. (*Id.* at 153:15–18.) He did not appear in court and was not criminally charged. (*Id.* at 154:22–24.)

About a month after Cabrera's arrest, Cabrera saw Doctor Steven Struhl at the urging of his then-attorney Kenneth Richardson. (*Id.* at 158:1–8.) Dr. Struhl found that Cabrera's wrist exhibited "no swelling" and had a "nearly full" range of motion. (Ex. J to Defs. Aff./Decl. (Doc. No. 42-10) at 2.) He noted some tenderness and "pain with resisted supination." (*Id.*) He directed Cabrera to get an MRI of his wrist, which Cabrera did not do. (*Id.* at 1.)

Cabrera was represented by counsel at the time the complaint was filed, and counsel drafted both the complaint and amended complaint. Cabrera's counsel then moved to withdraw, and Magistrate Judge the Honorable Ramon E. Reyes, Jr. granted that request. (*See* 4/4/2017 Order.) The defendants filed an unopposed motion for summary judgment. The Court granted Cabrera additional time to oppose the defendants' motion should he wish to do so. The defendants promptly served that Order on Cabrera. (*See* Doc. No. 50.) Cabrera then filed a brief opposition, and the defendants replied. (Pl. Opp'n (Doc. No. 51); Defs. Reply (Doc. No. 52).) For the reasons set forth below, defendants' motion is granted.

**LEGAL STANDARD**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original),

and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I. § 1983 Claims of False Arrest and False Imprisonment

The elements of a Section 1983 claim for false arrest are "substantially the same" as those of a "claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999). "Under New York state law, to prevail on a claim of false arrest a plaintiff must show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975), *cert. denied*, 423 U.S. 929 (1975)). "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). The same is true for false imprisonment claims. *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)

6

("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

An officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jocks*, 316 F.3d at 135 (internal quotation marks omitted). Probable cause is not negated simply because there may be an innocent explanation for the facts alleged, and "an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006).

Here, Officer Lindner had probable cause to arrest. Under New York law, the crime of criminal contempt in the second degree requires that (1) a valid order of protection existed; (2) the defendant knew about that order; and (3) the defendant intended to violate the order. N.Y.P.L. § 215.50(3). It is undisputed that both Officer Lindner and Cabrera knew about the First Order. It is also undisputed that Cabrera showed up to the precinct with Abreu, in violation of the terms of the First Order. Officer Lindner could infer Cabrera's intent to violate the First Order from his presence at the precinct with Abreu. *Carthew v. Cty. of Suffolk*, 709 F. Supp. 2d 188, 198 (E.D.N.Y. 2010). Typically, an "arresting officer's awareness of the protective order is itself a significant factor in establishing probable cause." *Id.* at 197 (collecting cases); *see also Otero v. Jennings*, 698 F. Supp. 42, 45 (S.D.N.Y. 1988) ("New York equates an order of protection with a showing of probable cause.").

In his amended complaint, Cabrera alleges that he was arrested for violating an "Order of Protection that was no longer in effect." (Am. Compl. ¶ 23.)[2] Though the Second Order superseded the First, Officer Lindner had probable cause to arrest Cabrera. On numerous occasions, courts have found that the arresting officer had probable cause where the officer "acted reasonably and in good faith in relying upon" what ultimately turns out to be mistaken information. *Welch v. City of New York*, No. 95-CV-8953 (RPP), 1997 WL 436382, at *5 (S.D.N.Y. Aug. 4, 1997) (internal quotation marks omitted). In *Welch*, for instance, the officer arrested the plaintiff for violating what turned out to be an expired order of protection. The court there held that the officer nevertheless had probable cause to arrest because the order appeared valid on its face, and the officer was told that arrest, under the circumstances, was mandatory. *Id.*; *see also Little v. Massari*, 526 F. Supp. 2d 371, 375 (E.D.N.Y. 2007) (finding that because "the face of the Orders of Protection did not necessarily give defendants notice that plaintiff might be relieved of some of the specific prohibitions that it included," the officer had probable cause to arrest for violation of the order).

Here, nothing on the face of the First Order indicated that it had expired. Officer Lindner inspected the First Order and found that it was facially valid. (Lindner Aff. ¶ 7.) It bore a judge's signature and court seal and was to remain in effect until December 4. (Ex. H.) Nothing on the face of the First Order indicated that it had been superseded, and, in fact, another officer did a computer check and informed Officer Lindner that the Order was still active. (Lindner Aff. ¶ 9.) The facial validity of the First Order plus the confirmation from the second officer that the First Order was still valid gave Officer Lindner probable cause to arrest Cabrera.

---

[2] Cabrera's opposition to the motion for summary judgment says only that there remain "clear issues of facts." (Pl. Opp'n at 1.) Besides stating that "[t]here was no crime, nor justification for the police conduct," Cabrera cites no law or fact to support his claims.

Officer Lindner's failure to undertake a more thorough investigation into the validity of the First and Second Orders does not alter the conclusion that probable cause existed to arrest Cabrera. As explained above, the First Order's facial validity, coupled with the information that the Order remained active, gave Officer Lindner probable cause to arrest, and "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (internal citation omitted); *see also Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.").

However, even if Officer Lindner knew about the Second Order prior to arresting Cabrera, she still would have had probable cause to arrest. In *Valcarcel v. City of New York*, for instance, the plaintiff told the arresting officer that the temporary order of protection had been vacated, but the officer arrested him anyway. No. 13-CV-1740 (KAM) (CLP), 2014 WL 4370814, at *2 (E.D.N.Y. Jul. 29, 2014), *report and recommendation adopted by*, 2014 WL 4370858 (E.D.N.Y. Sept. 2, 2014). The court there found that "the officer was under no obligation to investigate further simply on the basis of plaintiff's statement and that it would have been unreasonable to release the plaintiff in the absence of clear evidence that the [temporary order of protection] was not still extant." *Id.* at *9. Here, as in *Valcarcel*, it was not obvious from the face of the First Order that it was superseded, and, as a result, Officer Lindner had probable cause to arrest Cabrera on the basis of the First Order.

Alternatively, if Officer Lindner had been aware of the Second Order prior to arresting Cabrera, she, at the very least, would have had arguable probable cause. Officers have arguable

9

probable cause, and therefore are shielded from liability, where "it was objectively reasonable for the officer to believe that probable cause existed" or "officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Here, nothing on the face of the First Order suggested that it had been superseded. A database appeared to confirm that the First Order was still active. Both Orders were issued on the same day and were to remain in effect until December.

The amended complaint suggests that Officer Lindner should have further investigated by calling the court where the Orders were issued. (Am. Compl. ¶ 29.) However, "the role of the court is not to overly scrutinize the decisions of police officers from its vantage in chambers . . . but to determine whether the officers acted reasonably . . ." *Rae v. Cty. of Suffolk*, 693 F. Supp. 2d 217, 225 (E.D.N.Y. 2010) (internal citation omitted).

Here, Officer Lindner's actions were reasonable. Without knowing which Order superseded the other, and based on the information that the First Order was in fact valid, it was reasonable for Officer Lindner to arrest Cabrera. *See Carthew*, 709 F. Supp. 2d at 204 ("Qualified immunity protects from personal liability under § 1983 officers who make reasonable judgment calls under the circumstances – particularly when, as here, the officer is put in the middle of a heated and potentially volatile familial dispute."); *Little*, 526 F. Supp. 2d at 377. The Second Circuit has repeatedly emphasized that qualified immunity protects all but "the 'plainly incompetent and those who knowingly violate the law.'" *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Here, there is no such evidence of misconduct.

As acknowledged by the letter sent to Cabrera, the state court apparently made a mistake and kept open two active, but conflicting, orders of protection. This administrative slip-up led to

Cabrera's arrest. The ordeal, however trying for Cabrera, does not give rise to liability of Officer Lindner because she had probable cause – or at least arguable probable cause – to arrest. Cabrera's claims for false arrest and false imprisonment are dismissed.

## II.     Excessive Force

Cabrera alleges that Officer Lindner used excessive force by handcuffing him "to the point of causing him pain," and did not accommodate Cabrera's pleas that the handcuffs be loosened. District courts in this circuit have developed a three-prong analysis to evaluate an excessive force claim based exclusively on tight handcuffing. The court considers whether: "(1) the handcuffs were unreasonably tight; (2) the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." *Wang v. Vahldieck*, No. 09-CV-3783 (ARR) (VVP), 2012 WL 119591, at *7 (E.D.N.Y. Jan. 9, 2012) (internal quotation marks omitted). This last requirement is especially important because "to be effective, handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005).

There is consensus in the Second Circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort. *See, e.g.*, *Wilder v. Vill. of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of objective excess that reasonable police officers would consider to be unlawful conduct in an arrest situation."); *see also Hamlett v. Town of Greenburgh*, No. 05-CV-3215 (MDF), 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007); *Drummond v. Castro,* 522 F. Supp. 2d 667, 679 (S.D.N.Y. 2007); *Grant v. City of New York*, 500 F. Supp.2d 211, 217 (S.D.N.Y. 2007); *Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006). As one court explained, "handcuffing can give rise to a § 1983

excessive force claim where plaintiff suffers an injury as a result. However, if the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force." *Gonzalez v. City of New York*, No. 98-CV-3084 (ILG), 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000) (internal citations omitted). Indeed, "the most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage." *Usavage v. Port Auth. of New York and New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. Mar. 26, 2013) (collecting cases).

The record here does not reveal any injury sufficiently severe to survive summary judgment. Courts have routinely found that allegations like Cabrera's – that he was kept in handcuffs for several hours – do not amount to excessive force. *See Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 74–75 (E.D.N.Y. 2015) (collecting cases). Cabrera has not shown any injury to his wrist that the handcuffs may have caused, apart from his vague assertion that his wrist "cracks" and is "messed up." (Ex. F at 155:7–10.) His refusal to seek medical attention further suggests that Cabrera's discomfort did not rise to the level of excessive force in violation of the Fourth Amendment. At Central Booking, Cabrera underwent medical screening but declined medical attention for his wrist. Furthermore, Cabrera did not see a doctor about his wrist until a month after he had been handcuffed and only after his attorney instructed him to do so. Cabrera apparently told Dr. Struhl that an officer had "twisted his arm." (Ex. J at 2.) Dr. Struhl was unable to determine what injury Cabrera had sustained and directed Cabrera to get an MRI, which he never did. (*Id.* at 1.)

Thus, the Court concludes that any injury Cabrera sustained was *de minimis*, and thus warrants summary judgment. *See, e.g.*, *Lemmo v. McKoy*, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) ("Injuries held to be *de minimis* for purposes of defeating

excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth.") (internal citations omitted) (collecting cases).[3]

### III. Malicious Prosecution[4]

To succeed on a malicious prosecution claim under § 1983, a plaintiff must show (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice. *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (internal citation omitted). In addition, to maintain such a claim, the "deprivation of liberty – the seizure – must have been effected pursuant to legal process." *Singer*, 63 F.3d at 117 (internal quotation marks omitted). Typically, the legal process "will be either in the form of a warrant, in which case the arrest itself may constitute the seizure . . . or a subsequent arraignment, in which case any post-arraignment deprivations of liberty . . . might satisfy this constitutional requirement." *Id.* A "warrantless deprivation of liberty from the moment of arrest to the time of arraignment will find its analog in the tort of false arrest . . . while the tort of malicious prosecution will implicate post-arraignment deprivations of liberty." *Id.* (internal citation omitted).

Here, Cabrera's malicious prosecution claims fails for several reasons. First, as explained above, there was probable cause for his arrest. Second, Cabrera was neither arrested pursuant to a warrant, nor was he arraigned and charged with a crime. Accordingly, there was no

---

[3] Alternatively, Officer Lindner is entitled to qualified immunity on Cabrera's excessive force claim. She did not violate any "clearly established rights" by handcuffing Cabrera, and based on the minimal degree of injury sustained, "officers of reasonable competence could disagree" whether the tightness was reasonable. *Escalera*, 361 F.3d at 743.

[4] Cabrera does not address his malicious prosecution claims, or any of his remaining causes of action, in his opposition. However, in an abundance of caution and in light of Cabrera's *pro se* status, the Court will address the remaining claims and not deem them abandoned.

prosecution that could have been malicious, nor any proceeding that could terminate in Cabrera's favor. The defendants' motion for summary judgment on Cabrera's malicious prosecution claim is therefore granted.

## IV. Additional Claims

Cabrera alleges numerous additional claims, all detailed below. Each fails because Cabrera has not alleged any facts to support these claims.

### a. Eighth Amendment Violation

Cabrera brings an Eighth Amendment challenge. (Am. Compl. ¶¶ 36, 69D.) The Eighth Amendment, however, does not apply until "after conviction and sentence." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). Because Cabrera was never arraigned, his excessive force claim is governed by the Fourth, not the Eighth, Amendment. Accordingly, Cabrera's Eighth Amendment claim is dismissed.

### b. First Amendment Violation

Cabrera brings a First Amendment violation and alleges that the defendants violated his right "[t]o be free to exercise free speech." (Am. Compl. ¶ 69F.) To prevail on a First Amendment theory of retaliatory arrest, Cabrera must prove that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley*, 268 F.3d at 73). The Second Circuit has held that probable cause is a complete defense to a claim of retaliatory arrest. *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).[5] The Court has

---

[5] The Supreme Court's recent ruling in *Lozman v. City of Riviera Beach*, 585 U.S. __ (2018) does not alter this conclusion. In *Lozman*, the Court held that under certain circumstances, where a plaintiff alleges that his arrest was

14

already concluded that Officer Lindner had probable cause, or at least arguable probable cause, to arrest Cabrera. Furthermore, with respect to the third element, Cabrera has not shown that his First Amendment rights were "actually chilled." *Curely v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (quoting *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978)). Thus, his First Amendment retaliatory arrest claim is dismissed.

### c. Equal Protection Violation

Cabrera alleges in his amended complaint that the defendants discriminated against him on the basis of his race in violation of the Equal Protection Clause. (Am. Compl. ¶¶ 51–54.) "To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). Here, Cabrera has offered nothing beyond the bare assertion that he was arrested because he is Latino. He has not alleged any disparity in treatment between himself and another person, and besides mentioning in the amended complaint that he identifies as Latino, he alleges no other facts related to his ethnicity or national origin. *See Gordon v. City of New York*, No. 10-CV-5148 (CBA) (LB), 2012 WL 1068023, at *9 (E.D.N.Y. Mar. 29, 2012) (dismissing an equal protection violation claim where the plaintiff offered only bare assertions that the actions taken against him were because he "is of a minority race").

### d. *Monell* Liability

Cabrera also brings a *Monell* challenge against the City of New York. (Am. Compl. ¶ 63.) He asserts that New York and the New York Police Department have a policy of: fabricating evidence against innocent persons; arresting innocent persons notwithstanding the

---

prompted by an official municipal retaliatory policy, probable cause is not a defense to retaliatory arrest. Such circumstances are not present here.

existence of credible evidence exonerating the accused; violating the free speech rights of persons; assaulting and battering persons for no reason and without provocation; committing all of the above disproportionately against people of color. (*Id.*)

A municipality may be held liable under § 1983 only if the constitutional violation at issue results from the municipality's official policy. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). This policy may be an express policy or "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks omitted).

Under Second Circuit law, a "prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."). Here, the Court has not found any underlying constitutional violation, and therefore, Cabrera's *Monell* claim could be dismissed on this ground alone. In addition, as the defendants accurately point out, Cabrera's conclusory allegations about the City's alleged policies are insufficient to state a valid *Monell* claim. *See, e.g.*, *Ngemi v. Cty. of Nassau*, 87 F. Supp. 3d 413, 419 n.6 (E.D.N.Y. 2015) (noting that conclusory allegations of a policy and practice are insufficient to state a plausible *Monell* claim).

### e. Due Process Violations

Cabrera alleges violations of the Fifth and Fourteenth Amendments.[6] He alleges that the defendants' actions violated his right "[n]ot to be deprived of liberty without due process of law." (Am. Compl. ¶ 69(A).) As noted above, Cabrera's allegations that the City fabricates evidence against the innocent are simply too speculative to state a plausible Fourteenth Amendment violation. *See, e.g.*, *Rutigliano v. City of New York*, No. 07-CV-4614 (JSR), 2008 WL 110946, at *4 (S.D.N.Y. Jan. 2, 2008) ("Mere conclusory allegations of a deprivation cannot support a claim for a procedural due process violation.").

### f. State Law Claims

The amended complaint also appears to allege a number of state law violations, including intentional infliction of emotional distress, false arrest, negligent supervision, and negligent training. Because the Court dismisses all the federal claims, the Court declines to exercise its supplemental jurisdiction over Cabrera's state law claims. 28 U.S.C. § 1367(c)(3).

---

[6] The Due Process provision of the Fifth Amendment applies in actions against the federal government, not against state or local governments and officials. *Viteritti v. Inc. Vill. of Bayville*, 831 F. Supp. 2d 583, 592 (E.D.N.Y. 2011). Additionally, the Fifth Amendment provides guarantees to the right to a grand jury, prohibits double jeopardy and taking private property without just compensation, and protects the privilege against self-incrimination. None of these are relevant here.

## CONCLUSION

For the reasons stated herein, the defendants' motion for summary judgment (Doc. No. 40) is granted. The Clerk of Court is directed to enter judgment accordingly, mail a copy of this Order to *pro se* plaintiff Johans Cabrera, note the mailing on the docket, and close the case.

SO ORDERED.

Dated: Brooklyn, New York
September 26, 2018

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge